THEOPHILUS A. FITANIDES, APPLT.

*vs.*

ESTATE OF LAURA B. STICKNEY

York. Opinion, July 28, 1965.

*William P. Donahue,* for Plaintiff.

*Charles W. Smith,* for Defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, SIDDALL, MARDEN, JJ.

WILLIAMSON, C. J.  This is an appeal from the judgment of the Supreme Court of Probate affirming the disallowance of an instrument as the will of Laura B. Stickney in the Probate Court.  The appellant is the named executor.  The decisive issue is whether the purported will was the product of undue influence.

We examine the record giving full weight to the principle that "The findings of fact of the Justice in the Supreme Court of Probate stand unless clearly erroneous." *Barton* v. *Beck Estate,* 159 Me. 446, 448, 195 A. (2nd) 63; *Casco Bk. & Tr. Co. and Tomuschat, Applts.,* 156 Me. 508, 167 A. (2nd) 571; *Harriman* v. *Spaulding,* 156 Me. 440, 165 A. (2nd) 47; Maine Rules Civil Procedure, Rule 52 (a).

> "By undue influence in this class of cases is meant influence, in connection with the execution of the will and operating at the time the will is made, amounting to moral coercion, destroying free agency, or importunity which could not be resisted, so that the testator, unable to withstand the influence, or too weak to resist it, was constrained to do that which was not his actual will but against it." *Rogers, Appellant,* 123 Me. 459, 461, 123 A. 634.

> "As has been often reiterated, the burden of proof is on the party alleging undue influence.  The true test is the effect on the testator's volition.  It must be sufficient to overcome free agency, so that what is done is not according to the wish and judgment of the testator." *In Re Will of Ruth M. Cox,* 139 Me. 261, 272, 29 A. (2nd) 281.

See also *Tomuschat* and *Barton, supra,* and cases cited therein.

Without reviewing the record and the findings in detail, the Justice of the Superior Court sitting in the Supreme Court of Probate was warranted in finding as follows:

Laura B. Stickney, a physician for approximately 50 years in Saco, died on May 4, 1961. On the morning of May 25, 1960, then 80 years of age, she suffered what was referred to as a "stroke" and her left side was paralyzed. Her attending physician was called, and she was immediately taken to the Trull Hospital, owned and operated by her.

On May 26 while she was a patient at the hospital she executed the purported will drafted by the appellant, an attorney and brother of her daughter-in-law Marion. The instrument was witnessed by the appellant, who was the named executor, and two nurses employed at the hospital. Her son Richard and daughter-in-law Marion were also present. Her family consisted of a son Richard and his wife Marion, with five Stickney grandchildren, and a daughter Joan Cleary and her husband, with six Cleary grandchildren. Both Richard and Joan were adopted in infancy by Dr. Stickney and her deceased husband Joseph.

On March 29, 1960 Dr. Stickney executed a will drafted by Miss Margaret Currie, who had been her attorney for many years. Between the March will and the May "will" there was no change in the relationship of Dr. Stickney with her son and daughter, or their families.

In the May "will" after the usual provisions for payment of debts, funeral charges and expenses of administration, the executor was directed to pay all inheritance, estate, gift or other death taxes, thus freeing the specific bequests and devises from the burden of such taxes. The Trull Hospital, with its contents, but not however the bills receivable, to-

gether with a house in the rear of the hospital, were bequeathed and devised to Richard and Marion.

The remaining provisions read:

"3. I give and bequeath to Theophilus A. Fitanides, of Saco, the following shares of stocks as follows, nine hundred shares of American Tel. & Tel. Company common stock; three hundred shares of General Electric Company common stock; one hundred forty-five shares of Central Maine Power Company common stock; one hundred twenty shares of Federated Department Stores, Inc. common stock; twenty-nine shares of Socony Mobile Oil Company, Inc. capital stock; one hundred thirteen shares of Socony Vacuum Oil, Capital stock; two hundred fifty-nine shares of Public Service Electric-Gas Company of New Hampshire, common stock; one hundred ten shares of Atchison, Topeka & Santa Fe common stock; one hundred thirty-four shares of Beach-Nut Life Savers, Inc. common stock, IN TRUST, nevertheless, for the following purposes, with the following purposes and subject to the following conditions:

"1. The Trustee shall have authority to retain the above securities or sell the whole or any part thereof, and invest the proceeds in such securities and in such manner as to the Trustee may seem advisable, said Trustee is to maintain and manage said fund for the support and education of the children of Richard Stickney and Marion Stickney. Only in case of failure for any cause of either parent to support said children is support from said fund to be given to said children, except when in judgment of Trustee he believes support payments are necessary. My main interest is in the education of said children. When any of said children shall reach the age of twenty-five, he may request his equal share of said fund and said Trustee shall pay said equal share. In case of death of any child before they reach the age of twenty-five, then the remaining children shall share equally. The Trus-

tee shall be the sole judge of necessity of payments at all times.

"4. I direct my executor to sell, without license from Probate Court, any other real estate I may own at the time of my death, as soon after my death as such sales advantageously can be made. I also direct my executor to pay my obligations to the Canal National Bank of Saco, from the above proceeds and from other securities I own so that my pledged collateral will be returned to my estate and my bequest in paragraph three be carried out in the will.

"5. All rest, residue and remainder of my estate, I give and bequeath to the following: I give and bequeath to Joan Cleary, my beloved daughter the sum of twenty-five thousand dollars. I give and bequeath to the children of Joan Cleary the sum of five thousand dollars each. I give and bequeath to my sister Nina M. Gevalt, the sum of five hundred dollars. I give and bequeath to my sister-in-law, Mabel C. Black, the sum of five hundred dollars. I give and bequeath to my niece, Ruth Glazer, the sum of three thousand dollars. I give and bequeath to my nephew Frederick C. Gevalt the sum of three thousand dollars. I give and bequeath to my nephew Verne Black, the sum of three thousand dollars.

"6. I nominate Theophilus A. Fitanides, of Saco, to be executor of this my last will and testament, requesting that he be not required to give bond for the faithful performance of the duties of said office.

"7. In the event that the assets of my estate are insufficient to pay all of the specific bequests enumerated in the Fifth paragraph hereof said bequests shall be paid in full in the order in which they are set forth in said paragraph, prior to any payment in full or in part if any subsequent bequest or legacy."

In March Richard was given the Trull Hospital, with the contents but not the accounts receivable. In May, the same gift with the house in the rear added was made to Richard and Marion. No significance is attached to the changes in the wills with reference to the hospital.

Bequests to the same persons, all relatives, and of the same amounts found in May within the residue were made in March in the usual manner payable ahead of the residue.

The March 1960 will was well summarized in the findings as follows:

> " . . . after making certain small bequests, she devised the property known as the Trull Hospital to her son Richard; the remainder to Canal National Bank of Portland in trust, one-half of the income to be divided equally between Richard and Joan, and if Marion survived, then the income was to be divided equally between Joan and Marion, with the right to invade the principal, if in the sole judgment of the trustee, it became necessary for proper support and maintenance of the beneficiaries. The remaining one-half of the income and principal was to be held for the benefit of her grandchildren and following the specific directions given to the trustee, she further specifies 'It being my intention that one-half of my estate shall be distributed to my son's children and one-half to my daughter's children.' In this will, Margaret Currie was named the executrix."

On May 26, when the purported will was executed, Dr. Stickney did not possess sufficient property to meet the bequests to Joan and her children. She then owned stocks and securities worth $175,000 and owed the Canal National Bank $43,000, using approximate figures. In addition she owned the Trull Hospital with a small house in the rear, a house on Cutts Avenue in Saco, the accounts receivable of the hospital, and other property of no significant value.

In his findings the presiding justice said:

"The evidence clearly indicates that he [the appellant] was in possession of sufficient information to know that after payment of the funeral expenses, State and Federal taxes, the expense of administration, the debts of the testatrix, and satisfying the specific bequests to his sister and her family, there would be little, if anything, left for Joan and her children, to say nothing about the bequests to other relatives."

In a 1947 will, shortly after the death of her husband, Dr. Stickney, after small specific bequests, divided the remainder of her estate equally between Joan and Richard with certain trust provisions.

The presiding justice found with reference to the 1947 will an agreement between Dr. Stickney and her daughter, as follows:

"When Joseph Stickney died, he left an estate valued at $75,000.00. Joan inherited one-third of this estate. Dr. Stickney requested Joan to convey her interest in her father's estate to her. This, Joan did, and in the presence of Miss Margaret Currie, a lawyer and long time friend, Dr. Stickney said to Joan, 'You are not giving up anything, of course, because you will get not only this, but a great deal more from my estate, but I need it in order to get along.' Joan acquiesced, and transferred her interest in her father's estate to her mother; and Dr. Stickney executed a will prepared by Miss Currie, . . ."

By a 1948 will drawn in Miss Currie's absence by a Portland attorney there were trusts for Joan and her children and for Richard and his children. In 1951 the will was destroyed by reason of certain conditions relating to Richard and Marion which were objectionable to Dr. Stickney. No other wills are known to have been made by her.

On May 25 at about noon Dr. Stickney executed an instrument acknowledging the gift of her household furnish-

ings to Richard, Marion, and their children, with whom she had lived since giving a house to her son in 1958. Later in the day she executed an authorization dated May 26 for Marion to enter her safe deposit box at the Canal National Bank in Saco. The appellant prepared the instruments and witnessed Dr. Stickney's signature on each.

On May 26 Marion entered the safe deposit box, removed all securities and the March will, and delivered them to the appellant before the purported will was signed. The March will was destroyed by the appellant.

The appellant testified in substance that between May 5 and May 8 Dr. Stickney asked him to explain the March will, that he did so explain the will, that he discussed the impact of taxes, that Dr. Stickney gave him a list of securities to be placed in the trust, and that they discussed her debts and the desired disposition of her estate.

He testified:

> "She told me that the prime purpose or the main reason that she wanted a new will was to care for their children, Marion and Dick's children. . . She told me that she had promised Joe [her eldest grandson] that she would provide or pay for his medical education.
>
> "Q When you say Joe, you refer to Joseph Stickney, the oldest child, and her eldest grandson?
> "A Yes. And at that time she said she thought it would cost between $25,000 and $30,000 for a medical education, and that she couldn't very well leave Joe that without leaving his brothers and sisters an equal share, or words to that effect. In sum and substance that is what she said. She told me that I had been like a father to the kids, and that she was going to make me the executor and also the trustee, and she wanted me to be sure that the children did not want for anything. . . She told me that she had some debts at the Canal Bank and she wanted me to sell some real estate or any

of her assets to get this stock that was pledged down there back into the trust fund."

There is no evidence of any further conversation between Dr. Stickney and the appellant until May 24, when he says she wished to see him on the next morning. On arriving at her home he found Dr. Stickney was about to be taken to the hospital. Later on the 25th he says he talked with her and on her instructions prepared the "will" of May 26.

Here then a widowed mother, 80 years of age, hospitalized for shock, executes in terms her will effectively stripping her daughter and the daughter's children of a share in her substantial property to the benefit of her son, his wife and children.

Setting aside the gift of the hospital with the adjacent house and specific bequests to relatives, the equal division of her estate between the son with his family and the daughter with her family in substance maintained in prior wills was destroyed.

The trust for the son's children as of the date of the "will" had a value of about $130,000, whereas the stated amounts of the gifts to the daughter of $25,000 and to each of her six children amounted to $55,000 (or $60,000 if we include a seventh child born after May 26). Furthermore, the gift to the son's branch was of specific stocks and the money gifts to the daughter's branch came from the residue. If this were not enough to establish inequality between the branches of Dr. Stickney's family, it appears that the estate at the time of the execution of the "will" was not sufficient to meet the residuary gifts to the daughter's branch. There was only the illusion of bequests for Joan and Joan's children.

The disposition of her estate so natural in March became unnatural in May. There was no change in the relationship of the mother and her children and grandchildren within

this period. The trusted adviser and lawyer of March and the Bank then named executor gave way to a new adviser, attorney and executor, namely, the brother of her daughter-in-law.

We find no error in the decision of the presiding justice that the instrument of May 26 was the product of undue influence and was therefore not the will of Dr. Stickney.

In this view of the case it is unnecessary to consider the finding of the presiding justice to the effect that the purported will was executed under a mistake on the part of Dr. Stickney. We have examined the points raised with reference to rulings on evidence and are satisfied that no prejudice resulted therefrom.

The entry will be

*Appeal denied.*

*Costs and reasonable fees to counsel for the several parties, to be fixed in the Probate Court, and ordered paid from the Estate.*